COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RUSTY'S WEIGH SCALES AND SERVICE, INC., | § | No. 08-08-00148-CV |
| | § | |
| Appellant, | § | Appeal from the |
| | § | |
| v. | § | 134th District Court |
| | § | |
| NORTH TEXAS SCALES, INC., | § | of Dallas County, Texas |
| | § | |
| Appellee. | § | (TC# 04-02539-G) |
| | § | |

**O P I N I O N**

Appellant, Rusty's Weigh Scales and Service, Inc. ("RW"), appeals the trial court's judgment in favor of North Texas Scales, Inc. ("NTS"). We affirm.

**BACKGROUND**

Both RW and NTS are corporations that sell, service, test, install, and calibrate industrial weigh scales. RW's business, which was incorporated in 1986, focused on the West Texas area whereas NTS's business focused on the North Texas area. In 2000, NTS purchased Driver Scale, a smaller scale company that operated in West Texas, out of Lubbock.

Both companies sell, install, and service industrial weighing systems manufactured by GSE, a multi-national company. Those systems, referred to as indicators and powerful microcomputers at trial, are able to perform basic functions such as weighing, tracking, and printing. They also allow the distributors to customize the systems by installing additional software programs customized to a specific customer's needs.

GSE aids distributors in customizing the systems to meet individual customer needs by offering training, telephone support, and an on-line library of sample programs. However, some of

the distributors, such as RW, develop and install their own software programs. Indeed, RW had a special applications department devoted to researching and developing software programs tailored to a specific customer's needs. RW believed that those software programs were confidential and secret information, and gave it an "edge" over its competitors. However, those programs were not copyrighted or patented, and once they were sold to a specific customer, they had no value to competing businesses.

The GSE systems were accessed by entering a default access code. The distributors have the ability to change the code, but the industry custom was to leave the default access code so as not to prevent technicians from performing necessary repairs or services on the systems. Although RW initially adhered to the default code, it later started changing the codes. Indeed, RW, relying on information it obtained from GSE that it could protect the secret nature of its software, changed the codes when it sold the systems and when its employees left to prevent its competitors from servicing or repairing the equipment. Nevertheless, each system could still be accessed by entering a GSE backdoor code, regardless of any new pass codes entered by a distributor, which RW was unaware of.

When RW sold the GSE indicators with its customized software, the sales contract appeared to give the equipment and the software to the customer. The contracts did not restrict the customers' access to or use of the systems sold, or the customer's ability to modify or copy the software, nor did they state that RW retained ownership of the software or restrict the customer's use under an express license. Further, RW did not contract with customers for exclusive service, repair, or maintenance of the systems sold.

From 1993 until 1998, Shane Cole worked for RW, and for three of those years, Cole worked in the special applications department. During that time, Cole never signed a non-compete or

confidentiality agreement for RW, nor did he sign any other documents that would in any way limit his rights or abilities to work for a competing business. While at RW, Cole learned how to install the GSE systems, and after attending a GSE workshop, how to write software programs for the systems. When Cole left, he did not take with him RW's pass codes, software programs, or customer lists.

Cole's next job was with GSE where he trained and assisted distributors in the programming capabilities of the indicators. During his tenure, Cole learned how to access secured systems with a backdoor code. Later, Cole accepted a job with NTS, where he was employed from 1998 to 2003.

While working for NTS, some of RW's customers asked Cole to service or repair their systems. Those customers switched to NTS because they were upset with RW's customer service. To access those systems and thus bypass RW's pass codes, Cole used the backdoor code.[1] When he finished servicing or repairing the systems, Cole reset the code back to the factory default code or to one requested by the customer so that other technicians that needed to access the system could.

From 2000 through early 2003, RW experienced unexplainable problems accessing its sold software programs. Presumably, RW's pass codes were changed when NTS serviced the customer's equipment. When RW learned that GSE or other competitors could access the indicators with the backdoor code, GSE offered to replace the indicators with new EPROM chips that would prevent access by the backdoor code. However, RW would bear the cost of travel and labor in replacing the systems. GSE then shipped 630 of the new EPROMs to RW. RW had sold approximately 980 systems that needed the new chips.

RW later sued SPX Corporation (GSE's parent corporation), NTS, and Shane Cole for breach

---

[1] NTS denied knowing that Cole used the backdoor code, and Rodney Owens, the owner of NTS, testified that he would fire an employee for using the backdoor access code.

of contract, violation of the Texas Deceptive Trade Practices Act, theft of trade secrets, conversion, negligence, and tortious interference with contracts. SPX and Cole settled, and RW dismissed its claims against them. At trial, RW restricted its theories of liabilities against NTS to misappropriation of trade secrets and tortious interference with contracts. Once RW filed its suit against NTS, RW's technical problems seemingly resolved and its revenues increased.

At trial, Joe Jackson, vice-president of sales for RW, testified to damages. According to Jackson, RW had replaced approximately half of the 980 systems it sold with the new EPROM chips, and would need to replace the other half. Jackson estimated the labor costs at $320 per system and the travel costs to each site at $200. However, RW produced no invoices for those EPROMs it had already replaced, nor any customer requests that the systems be replaced. Additionally, Jackson noted that it was not traveling to each site to replace the systems unless RW needed to go to the site for another reason. Further, Jackson failed to produce any documentation of those units that remained to be repaired and how much each individual unit would cost to repair. Rather, Jackson testified that the court would have "to rely just on [his] testimony."

At the conclusion of the trial, the trial court rendered judgment for RW. However, NTS moved to modify and vacate the judgment, and after a hearing, the trial court vacated the initial judgment. After another hearing, the trial court rendered a final take-nothing judgment in favor of NTS and issued findings of fact and conclusions of law.

### DISCUSSION

On appeal, RW raises four issues, challenging the legal and factual sufficiency of the evidence to support the trial court's findings of fact on its misappropriation-of-trade-secrets claim.[2] Specifically, RW challenges the trial court's adverse findings on the four elements it was required

---

[2] RW does not contest the trial court's adverse ruling on its tortious-interference-with-a-contract claim.

to prove to succeed on its claim: (1) the existence and ownership of a trade secret (Issue One); (2) breach of a confidential relationship or improper discovery of a trade secret (Issue Two); (3) use or disclosure of the trade secret (Issue Three); and (4) damages to the owner (Issue Four). *Hyde Corporation v. Huffines*, 158 Tex. 566, 575, 314 S.W.2d 763, 769 (1958); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.–Austin 2004, pet. denied); *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 476 (Tex. App.–Amarillo 2001, pet. denied). Because RW was required to prove each element, and because we believe that the trial court properly concluded that RW failed to present sufficient evidence to establish the fourth element, that is, damages, we need not address RW's remaining claims.

## Standard of Review

In reviewing a trial court's findings of fact for legal and factual sufficiency, we apply the same standards that we apply in reviewing jury findings. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Jurek v. Couch-Jurek*, 296 S.W.3d 864, 871 (Tex. App.–El Paso 2009, no pet.). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id*. at 827. We then determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *Id*. In so doing, we recognize the fact finder's role as the only judge of witness credibility and the weight to give to testimony. *See id*. at 819.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). After considering and weighing all the evidence, we set

aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986), *overruled on other grounds by Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000). Again, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615-16 (Tex. App.–Houston [14th Dist.] 2001, pet. denied), and we will not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

*Application*

In challenging the damages element, RW contends that it was entitled to recover lost profits, out-of-pocket expenses, and exemplary damages.[3] RW candidly admits that it produced no documentary evidence to support a damage award but argues that documentation was not required. We discuss lost profits first.

*Lost Profits*

Recovery of lost profits does not require that the loss be susceptible to exact calculation. *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). Nor is the injured party required to produce in court the documents supporting the lost-profits opinions or estimates. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). However, he must do more than show that he suffered some lost profits. *Tex. Instruments, Inc.*, 877 S.W.2d at 279. Indeed, the injured party must show the amount of the loss by competent evidence with reasonable

---

[3] According to RW, the trial court's findings of fact on damages are not supported by the evidence presented at trial. Those findings are: "(52) [RW's] damages expert produced no documents, invoices, service records or any other form of objective data to support his damages calculation;" "(53) [RW's] damages expert produced no records of requests for service, or records of which units had been repaired, which remained to be repaired, why the units had to be repaired, or how much it costs to repair any particular unit."

certainty. *Id*. "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton Indus., Inc.*, 835 S.W.2d at 84. "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits [may] be ascertained." *Id*. "[T]he bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits." *Id*. at 85.

Here, RW asked the court for $2 million in lost profits. However, Jackson specifically testified that he did not know how he determined that RW sustained $2 million in lost profits. Although RW offered its tax returns into evidence, which showed RW's gross sales averaged between $2 million to $3 million for the 1995 to 2003 tax years, and that in 2005 and 2006, RW's gross sales were $4.2 million and $4.9 million, Jackson never testified as to how those tax returns supported an award of $2 million in lost profits, nor did he provide any calculations showing how, based on the tax returns, RW lost profits of $2 million. Jackson merely speculated that RW lost $2 million in profits and failed to support his assertion with any objective figures or data. *See Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649-50 (Tex. 1994) (finding defendant's counterclaim for lost profits speculative when defendant's secretary and treasurer testified that they expected to make a profit of $250,000 to $500,000 per year without any showing of how they determined the amount of lost profits).

Further, RW's claim for lost profits was based on its assumption that it lost customers based on NTS's alleged use of RW's software. However, RW was not under any contracts with its clients once the systems were sold. Moreover, the evidence showed that at least three of RW's former customers switched to NTS because of dissatisfaction with RW's customer service, that NTS simply outbid RW for jobs, or that NTS bought the company that previously provided service to the client. RW did not negate this evidence, nor did it offer any evidence that it actually lost any business

because NTS had copied, sold, or used RW's software. *See Holt Atherton Indus., Inc.*, 835 S.W.2d at 85 (simply stating company lost several contracts without specifying which contracts were lost, how many were lost, how much profit they would have had on the contracts, or who would have awarded them contracts, was insufficient to establish lost profits).

Lost profits must be non-speculative and corroborated. Because there was no reliable, non-speculative evidence on lost profits, RW failed to present legally sufficient evidence of the same. *See Szczepanik*, 883 S.W.2d at 649-50; *Holt Atherton Indus., Inc.*, 835 S.W.2d at 84. Therefore, the trial court correctly concluded that RW was not entitled to lost profits.

*Out-of-Pocket Damages*

RW also asked for out-of-pocket damages. Out-of-pocket damages measure the difference between the value the buyer paid and the value of what he received. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997); *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex. 1984). More generally, in order to recover any type of damages, a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant. *See Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex. 1997); *Washington Mut. Bank v. Houston Windcrest West Road I, L.P.*, 262 S.W.3d 856, 862 (Tex. App.–Dallas 2008, pet. denied).

Here, RW asked for its out-of-pocket expenses it incurred by traveling to each indicator, replacing it with a new secured indicator, and recalibrating the equipment. NTS responds that RW's claim for such expenses should be directed at GSE. We agree.

RW believed that the indicators it bought from GSE were secured and could only be accessed by the code RW chose to input. However, GSE later informed RW that the indicators could still be accessed by GSE's backdoor code regardless of RW's new pass code. Outraged that RW did not

receive what it believed it purchased, RW threatened suit and GSE settled by giving RW new firmware that could only be accessed by a code RW chose, rather than the backdoor code. Recognizing that GSE only agreed to give RW new firmware but not reimburse RW for traveling to each indicator, replacing it, and then recalibrating the equipment, RW wanted NTS to pay those expenses. But those out-of-pocket expenses resulted from GSE's conduct, not NTS's conduct. Indeed, RW believed it purchased indicators from GSE that could be locked but received indicators that could still be accessed by a backdoor code. NTS was neither the seller of the equipment, nor the warrantor that the equipment could not be accessed. In fact, any competitor aware of the backdoor code could access the equipment. There is simply no evidence that NTS, rather than GSE, altered RW's position; rather, RW, believing its software programs were secret, would still replace all the equipment upon learning of the backdoor code regardless of whether Cole ever used it to access the indicators. Accordingly, because RW has not shown that NTS was responsible for its out-of-pocket expenses, the trial court properly concluded that RW was not entitled to the same. *See, e.g., McKnight v. Hill & Hill Exterminators, Inc.,* 689 S.W.2d 206, 209 (Tex. 1985) (finding termite company not liable for damages when the termite damage could have existed before owner entered into a contract with defendant for termite treatment); *Deli Management & Development, Inc. v. Damon Builders & Developers*, Inc., No. 14-00-00102-CV, 2001 WL 1428353, at *2-3 (Tex. App.–Houston [14th Dist.] Nov. 15, 2001, no pet.) (op., not designated for publication) (because roof would have collapsed anyway, builder not liable for damages when he previously connected beams to wall studs).

*Exemplary Damages*

Last, RW contends it was entitled to exemplary damages. Exemplary damages are levied against a defendant to punish the defendant for outrageous, malicious, or otherwise morally culpable

conduct. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex. 1994) (op. on reh'g). A mere showing that the act is wrong or unlawful is not sufficient to support an award of exemplary damages. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 454 (Tex. 1996). Rather, exemplary damages may only be awarded where there is proof by clear and convincing evidence of fraud, malice, or gross negligence. *See* Act of Apr. 20, 1995, 74th Leg., R. S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110 (amended 2003) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (Vernon 2008)). At trial, RW argued that NTS acted with malice.

Malice involves acting with ill will, spite, evil motive, or purpose to injure or harm. *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 628 (Tex. 2004); *Cont'l Coffee Prods.*, 937 S.W.2d at 452. Thus, to establish that NTS acted with malice, RW had to prove a specific intent by NTS to cause substantial injury or harm to RW. *See* Act of Apr. 20, 1995, 74th Leg., R. S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (amended 2003) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7)). Moreover, RW had to show that NTS's conduct involved an objective extreme risk of harm and that NTS had a subjective "actual awareness" of an extreme risk created by its conduct. *See Transp. Ins. Co.*, 879 S.W.2d at 21; *Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 447 (Tex. App.–Texarkana 2006, no pet.). That harm must be extraordinary such as death, grievous physical injury, or financial ruin. *Kinder Morgan*, 202 S.W.3d at 447.

After reviewing the record, we are unable to find any evidence of a specific intent to injure RW. Although accessing the indicators with the backdoor code was "unethical," it was not malicious. *See Cont'l Coffee Prods. Co.*, 937 S.W.2d at 454 (not every unlawful or wrongful act is malicious.). Cole's intent in accessing the GSE indicators with the backdoor code was to repair or service the equipment. There was no evidence that Cole was accessing the indicators for the purpose

of copying the software to sell to other customers. Also, when Cole finished repairing or servicing the equipment, he reset the code to the factory default code, which was listed in the GSE manual, or a code requested by the customer. In other words, neither Cole nor NTS were acting with the intent of locking RW or other competitors out of the indicators.

RW asserted at trial that NTS stole its customers by accessing their systems. However, other than RW's bare assertions, it produced no evidence to that effect. Rather, the evidence actually established that the customers switched to NTS after paying for faulty equipment and experiencing bad customer service with RW. Further, NTS simply outbid RW on future jobs. This is not evidence of stealing customers but rather evidence of the customer's right to chose its service provider and marketplace competition.

Simply, there is no evidence of a specific intent to harm RW, much less of an intent to cause *substantial* injury to RW. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7). After reviewing the evidence, the evidence is not such that the fact finder could form a firm conviction that NTS acted with malice or that an act of malice was committed for which RW was responsible. Therefore, the trial court did not reversibly err by concluding the evidence insufficient to support an award of exemplary damages. *See Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009) (client not entitled to recover exemplary damages when there was no showing that firm specifically intended to cause substantial injury to client); *Shed, L.L.C. v. Edom Wash'N Dry, L.L.C.*, No. 12-07-00431-CV, 2009 WL 692609, at *9 (Tex. App.–Tyler Mar. 18, 2009, pet. denied) (finding no evidence of intent to cause substantial injury, and therefore, no malice to support exemplary damages, when Shed blocked a more direct path to Edom but provided ingress and egress across its property). We overrule RW's fourth issue.

**CONCLUSION**

Because RW was required to prove all four elements of its misappropriations-of-trade-secrets claim, and because the trial court did not err by concluding that the evidence was legally and factually insufficient to show the fourth element, that is, damages, we need not address RW's remaining issues. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). Accordingly, we affirm the trial court's judgment.

GUADALUPE RIVERA, Justice

April 7, 2010

Before Chew, C.J., Rivera, and Larsen, JJ.
Larsen, J. (sitting by assignment)