# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00358-CV

**Russell H. Fish, III, individually and derivatively on behalf of
Texas Legislative Service, Partnership, Appellants**

**v.**

**Texas Legislative Service, Partnership; Andrew K. Fish; and John C. Fish, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-GN-08-002264, HONORABLE ERIC SHEPPERD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Russell H. Fish, III, individually and on behalf of Texas Legislative Service ("TLS"), sued TLS partners Andrew K. Fish and John C. Fish, alleging that they violated various terms of the TLS partnership agreement, breached their fiduciary duties, and misappropriated TLS's trade secrets and copyrights.[1] The trial court granted summary judgment in John[2] and Andrew's favor on all claims and denied Russell's motion for partial summary judgment on a breach-of-contract claim related to compensation Andrew and John paid to themselves for working in the business. We will affirm in part and reverse and remand in part.

---

[1] TLS was also included as a nominal defendant.

[2] Because the parties and other TLS partners share the same surname, we will refer to them by their first names to avoid confusion.

**FACTUAL AND PROCEDURAL BACKGROUND**

TLS is a legislative tracking service providing subscribers with information about the activities of the Texas Legislature, including legislator voting patterns, bill histories, hearing schedules, and calendars. TLS was started in 1924 by Walter E. Long and became a family partnership in 1953. The original partnership agreement was amended from time to time, and the dispute at issue in this case involves the TLS partnership agreement executed in 1979, which remains in effect today subject to certain amendments concerning transfers of partnership interests and partner retirement payments.[3]

In the 1979 partnership agreement, Russell and his brothers Andrew and John were named TLS partners along with other relatives, including their father Russell H. Fish, Jr. and their mother Janet Long Fish. At the time the 1979 partnership agreement was executed, the partners and their respective interests in TLS were defined in the agreement as follows:

| | |
|---|---|
| Janet Long Fish | 25% |
| James Colbert Fish | 16.67% |
| Andrew Kaapke Fish | 12.5% |
| Russell H. Fish, Jr. | 12.5% |
| Russell Hamilton Fish III | 8.33% |
| John Colbert Fish | 8.33% |
| Walter Cromer Long | 4.17% |

---

[3] Although the text of those amendments is not in the record, there are no claims concerning the amendments, and there is no claim that any such amendments are material to the present dispute.

2

| James Colbert Fish, as Trustee for James Colbert Fish, Jr., Jennie Marie Fish, and Anne Louise Fish | 4.17% for each beneficiary |

By virtue of various transactions over the years, the current partnership interests in TLS are:

| Andrew K. Fish | 38.89% |
| John C. Fish | 33.32% |
| Russell H. Fish III | 11.11% |
| James C. Fish, Jr. | 5.55% |
| Jennie M. Fish | 5.55% |
| Anne L. Fish | 5.55% |

Together, Andrew and John have held a majority interest in the partnership since 1994, when they purchased equal shares of their mother's interest.

In relation to the claims in this lawsuit, the parties distinguish between "working partners," meaning those partners who work in the business, and "nonworking partners," referring to those partners who do not work in the business. Of the current partners and the partners identified in the 1979 agreement, only Andrew, John, their uncle James, and their parents, Russell Jr. and Janet, have ever worked in the business. For some period of time before the 1979 partnership agreement was executed, Russell Jr. was TLS's manager, but the 1979 agreement established James as the manager. James held that position until 1986 or 1987, when Andrew was elected the manager and James left the company. Andrew has worked continuously in the business since 1976, and John has worked continuously in the business since 1981. Currently, Andrew and John are the only partners

3

who work at TLS, and that has been the case since their mother retired in 1994 and withdrew as a TLS partner.

During Andrew's tenure as manager, Andrew and John have set their compensation without notice to or express consent of any partners not working in the business, including their brother, Russell. Before Andrew became manager, James followed the same practice, as did Russell Jr. before him. As specified in the 1979 partnership agreement, salaries paid to working partners are deducted from TLS's revenue before any residual profits are distributed to the partners on a pro-rata basis. Thus, compensation paid to partners working in the business directly impacts the proceeds available for distribution to all partners, and that has been the case for the entire time that Russell, Andrew, and John have been TLS partners.

Following Janet's death in 2008, Russell, individually and on behalf of TLS, sued Andrew and John, alleging that over the course of twenty or more years they (1) engaged in activities that violated various provisions of the 1979 partnership agreement and (2) misappropriated TLS's trade secrets and copyrights in connection with legislative tracking businesses Andrew separately owns or owned in other states. Russell further alleged that by engaging in these activities, Andrew and John breached their fiduciary duties of loyalty and care to TLS and its partners.

With regard to the breach-of-contract claims, Russell asserted that Andrew and John repeatedly denied him access to TLS books and records in violation of section 1.5 of the partnership agreement[4] and siphoned off TLS revenue that should have been distributed pro-rata to the partners

---

[4] Section 1.5 provides: "The partnership books and records shall be maintained at the principal place of business of the partnership, and the partners shall have access thereto at all times."

4

by paying themselves salaries, bonuses, and other compensation without unanimous consent of the partners as required in section 2.5 of the agreement and by paying themselves more frequently than on a monthly basis.[5] Russell also asserted that Andrew's and John's 1994 purchases of their mother's interest in the company violated sections 4.41 and 4.43 of the partnership agreement because (1) the sale agreements had payment terms of 144 months following Janet's withdrawal from the partnership instead of the six-month time period specified in the partnership agreement, and (2) the initial promissory notes were amended in 2001 to eliminate the security interest required by the partnership agreement.[6] Russell also alleged that Andrew, with John's acquiescence,

_____

[5] Section 2.5, governing salaries to partners, provides, "For each fiscal year, the partners shall receive such monthly salaries as the partners mutually agree shall be paid. Salaries payable under this article shall be deducted from the partnership income as in the case of any other partnership expense, in determining net profit or net loss distributable under Article 2.3."

[6] The pertinent provisions are as follows:

    4.4.    Terms and Nature of Payment.
        4.41.   In the event of the withdrawal of a partner, payment for the value of the interest or interests in the partnership, as determined under Article 4.31[,] shall be made on the following terms unless assigned or willed under Article 4.23 [partnership interest may be sold or assigned, in whole or in part, to another partner] or 4.24 [partnership interest may be passed by devise to another partner]:
            (1)   One-third (1/3) within ninety (90) days after date of withdrawal or date the option to buy out the remaining partners is exercised; and
            (2)   Balance within six (6) months after date of withdrawal or date the option to buy out the remaining partners is exercised.

    . . . .

    4.43.   All payments due under this Article shall be evidenced by a promissory note or notes secured by a lien upon the partnership

5

improperly formed competing legislative services businesses in other states, beginning in the early 1980s and continuing through the early 2000s, in violation of the noncompete provision in section 7.41 of the partnership agreement.[7] In addition, Russell alleged that, in forming these out-of-state businesses, Andrew misappropriated TLS trade secrets and infringed TLS copyrights by using, selling, or leasing TLS-owned software, again with John's acquiescence. The breach-of-fiduciary-duty claims were premised on the same allegations underlying the breach-of-contract and intellectual-property-misappropriation claims, with scant elaboration.[8]

---

interest so purchased. Such note or notes shall be executed by the purchasing partner or partners and shall bear interest at the prime rate of interest being charged by the Banks of Austin, Texas, not to exceed 10% per annum.

[7] "7.4. Covenant Not To Compete.
7.41. Each of the partners hereby recognizes and acknowledges that the partnership owns and possesses certain trade secrets which consist of, among other things, methods, processes, computer programs, customer lists, prices and pricing, markets, and data regarding contracts and customer needs. . . . Therefore, in order to assure adequate protection to the partnership against the wrongful use or disclosure of such trade secret information, each partner agrees that:

(1) In the event the partner is no longer a partner in the partnership or is no longer employed by the partnership, such partner will deliver to the partnership all [such trade secret information]; and

(2) For a period ending on the last day of the second Regular Session of the Texas Legislature next succeeding the date of termination of employment or termination as a partner (whichever comes last), the said partner will not engage in competition, directly or indirectly, with the partnership. . . ."

[8] Russell alleged generally that Andrew and John breached their fiduciary duties by (1) refusing to give an accounting for the TLS Partnership, (2) self-dealing, (3) competing with the partnership by opening similar companies in other states, (4) paying themselves excessive

Andrew and John asserted a number of defenses to the foregoing claims, including statute of limitations, waiver, and quasi-estoppel based on Russell's considerable delay in prosecuting his claims. Andrew and John also challenged the allegations on a number of substantive grounds, including contending that section 2.5 of the agreement unambiguously authorizes them to set their own salaries as majority interest holders and as a majority of the partners working in the business or, alternatively, section 2.5 is ambiguous and the historical practice of allowing the working partners to set their salaries is conclusive evidence of section 2.5's intended meaning. In addition, they averred that Russell never came to TLS's principal place of business to request access to the records and books and they had never denied him such access. Andrew and John further asserted that Russell suffered no damages resulting from their purchase of Janet's TLS partnership interest on terms other than those specified in the partnership agreement.

Regarding the competition and misappropriation claims, Andrew and John asserted, among other things, that (1) none of the out-of-state businesses compete with TLS because TLS concerns only the Texas Legislature and none of the other companies has ever competed in the Texas market, (2) TLS has never competed in any out-of-state market, (3) at least some of the partners expressly authorized Andrew to open legislative services businesses in other states as far back as 1977, (4) none of the other business opportunities were available to TLS because the partnership agreement prohibits TLS from incurring any debt, which made it impossible for TLS to start any new businesses, (5) Russell admitted that he had been aware of Andrew's other businesses for at least

_____

compensation and large bonuses, (5) funding self interests with partnership profits, (6) failing to disclose raises or bonuses, (7) failing to act in good faith in discharging the partner's duties, (8) using partnership proprietary and trade secrets, and (8) failing to disclose competitors and other companies in which Andrew has an interest.

7

15 years before filing the underlying lawsuit, (6) by its express terms, the noncompete provision in the partnership agreement applies only when a partner is no longer a TLS employee or has withdrawn from the partnership, (7) Andrew did not use or disclose any TLS trade secrets in relation to his other businesses, (8) John did not use or disclose any TLS trade secrets or use them in connection with any other businesses and he was not an owner or participant in any of Andrew's businesses, and (9) Andrew developed and owns the software that TLS uses and thus did not misappropriate it or infringe on any TLS copyrights.

The parties filed cross-motions for summary judgment on the issue of interpretation of and compliance with section 2.5 of the partnership agreement. In addition, Andrew and John filed traditional and no-evidence motions for summary judgment on each of Russell's claims and sought affirmative relief on the ground that his claims are barred in whole or in part by the applicable statutes of limitations. Andrew and John further opposed Russell's motion for partial summary judgment on the grounds that Russell waived the right to enforce section 2.5 or was precluded from doing so by the equitable doctrine of quasi-estoppel. In addition, they asserted that a fact issue existed regarding whether the language in section 2.5 was a product of mutual mistake of fact. Andrew and John did not, however, move for summary judgment on their waiver, quasi-estoppel, and mutual-mistake defenses.

Following a series of nonsuits[9] and trial court rulings on the parties' partial motions for summary judgment, the trial court rendered final judgment in favor of Andrew and John on all

---

[9] Similar claims by an additional party, Robert Anderson, trustee of the Fish Family Trust, were nonsuited in the trial court and are not at issue on appeal. In addition, Russell nonsuited claims related to a requested accounting or audit of both the TLS partnership and TLS Properties, which is a separate entity that had owned the building in which TLS operated at some point in time.

claims. The trial court's orders are silent as to the grounds relied upon; however, it must be inferred that the trial court agreed with Andrew and John's interpretation of section 2.5 as unambiguously authorizing them to set their own compensation because the only other ground for relief raised in their motion for summary judgment—statute of limitations—would have resulted in, at most, a partial bar to Russell's recovery for damages accruing more than four years before the lawsuit was filed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (West 2008) (four-year residual statute of limitations applicable to breach-of-contract claims).

In three omnibus issues on appeal, Russell contends that the trial court (1) erroneously denied his motion for partial summary judgment on his claim that Andrew and John breached section 2.5 of the partnership agreement by paying themselves a salary, bonuses, and other compensation without the unanimous approval of all partners and paying such compensation other than on a monthly basis and (2) erroneously granted Andrew and John's motion for partial summary judgment and motion for final judgment on all of Russell's claims.

## DISCUSSION

Whether summary judgment is proper is a question of law that we review de novo, viewing the evidence in the light most favorable to the non-movant and resolving all doubts in the non-movant's favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). "Traditional" summary judgment is proper if (1) there is no genuine issue of material fact, and (2) the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). A defendant who conclusively negates at least one essential element

of a plaintiff's cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2003).

"To prevail on a no-evidence summary-judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's claim." *Southwest Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing Tex. R. Civ. P. 166a(i)). The burden then shifts to the nonmovant to produce more than a scintilla of probative evidence to support each challenged element of its claims; absent such evidence, the movant is entitled to summary judgment. *Forbes, Inc. v. Granada Biosciences*, 124 S.W.3d 167, 172 (Tex. 2003).

When the trial court's order granting summary judgment does not specify the grounds relied upon, we must affirm summary judgment if any of the grounds asserted in the summary-judgment motion are meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). In addition, when both parties move for summary judgment on the same claim and the district court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment that the trial court should have rendered. *Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 648 (Tex. 2004).

### *Payment of Compensation without Unanimous Partner Approval*

Under Texas's general partnership law, partners are not entitled to compensation for services performed on behalf of the partnership, except compensation for services rendered in

10

winding up partnership business. Tex. Bus. Orgs. Code Ann. § 152.203(b) (West Pamph. 2010).[10]

However, if the partners have executed an agreement authorizing compensation, as they did in this

case, the terms of that agreement govern any dispute concerning compensation. *See id.* § 152.002(a)

(stating that "a partnership agreement governs the relations of the partners and between the partners

and the partnership"). Section 2.5 of the TLS partnership agreement states, "For each fiscal year,

the partners shall receive such monthly salaries as the partners mutually agree shall be paid." The

heart of the dispute in this case is the proper interpretation and application of this provision and, in

particular, the meaning of the phrase "partners mutually agree."

Russell contends that section 2.5 is unambiguous and does not authorize a working

partner to receive any compensation absent the unanimous consent of all the partners. He further

contends that section 2.5 neither authorizes salaries to be paid more frequently than on a monthly

basis nor allows the payment of bonuses or any other special compensation. Russell asserts that he

was entitled to summary judgment because it is undisputed that, during Andrew's tenure as manager,

Andrew and John were paid monthly salaries described in company financial records as "regular

pay" as well as periodic payments described as "bonuses" and "special payments," all without notice

to the nonworking partners and without their unanimous consent.

---

[10] The allegations in this case span decades, potentially implicating three different statutory schemes governing general partnerships that have existed in that time period. Although the parties scarcely discuss the statutory overlay, it appears that any differences among the potentially applicable statutory schemes are not material to the issues on appeal in this case. Therefore, in this opinion we will cite to the current general partnership law, Tex. Bus. Orgs. Code Ann. §§ 152.001–.914 (West Pamph. 2010), for convenience.

Andrew and John counter that section 2.5 unambiguously authorizes them to set their own compensation both as majority interest holders and as a majority of the working partners. They further assert that, although section 2.5 speaks in terms of "monthly" salary, the bonuses and special payments they received were deferred compensation, payable if and when the company's cash flow allowed for payment because the nature of TLS's business resulted in an irregular cash flow. They dispute Russell's claim that section 2.5 requires that they be paid the same amount every month in a single monthly payment and contend that any such limitation is immaterial to the extent they have the contractual right to set their own compensation. In response to Russell's summary judgment motion, but not on appeal, Andrew and John also proffered the alternative argument that section 2.5 is ambiguous and that a fact issue exists regarding the proper interpretation of section 2.5 based on the historical practice of allowing the working partners with a majority interest to determine partner compensation.

Our primary objective in this case is to ascertain the true intent of the parties as expressed in the partnership agreement. *National Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1994). If the terms used in the contract can be given a definite or certain legal meaning, the contract is unambiguous and will be enforced as written. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). In construing the partnership agreement's language, we must apply the ordinary and generally accepted meanings of the words used unless the contract indicates that the language used is intended to impart a technical or different meaning. *Id.* at 158. In addition, we must give effect to all provisions so that none are rendered meaningless. *Id.* at 157. "Surrounding circumstances may be considered—not

to determine a party's subjective intent—but to determine the appropriate meaning to ascribe to the language chosen by the parties." *Moon Royalty, LLC v. Boldrick Partners*, 244 S.W.3d 391, 394-95 (Tex. App.—Eastland 2007, no pet.); *see also National Union*, 907 S.W.2d at 521. However, extrinsic evidence is not admissible for the purpose of creating an ambiguity, and an ambiguity does not arise simply because the parties offer conflicting interpretations. *National Union*, 907 S.W.2d at 520; *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)*.* If the language of the contract is susceptible to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, thus authorizing a court to consider the parties' interpretations and admit extrinsic evidence to determine its true meaning. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *National Union*, 907 S.W.2d at 520.

In section 1.1 of the partnership agreement, the "partners" are identified as all interest holders, not just those partners working in the business. The term "partners" is used repeatedly throughout the contract in ways that would necessarily require its interpretation to include all partnership interest holders, not just working partners and not just the holders of a majority in interest. We reject Andrew and John's suggestion that the term "partners" is limited to working partners or majority interest holders when used in section 2.5; such a cabined construction of the term does not comport with either its ordinary or specially defined meaning and is wholly lacking textual support.

The phrase "mutually agree" is not defined in the partnership agreement. Proper construction of that phrase begins with the plain, ordinary, and commonly understood meaning of

13

the term "mutual." Black's Law Dictionary defines the term "mutual" as "directed by each toward the other or others; reciprocal." *Black's Law Dictionary* 1115 (9th ed. 2009). Other relevant dictionary definitions of the term include "entertained, proffered, or exerted by each with respect to the other of two or to each of the others of a group . . . given and received in equal amount . . . shared in common . . . possessed, experienced, or done by two or more persons or things at the same time: JOINT . . . ." *Webster's Third New Int'l Dictionary* 1493 (2002); *accord* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 578 (2d ed. 1995) (defining "mutual" as "reciprocal; directed by each toward the other(s)"). The plain meaning of the term "mutual," as used in section 2.5, thus connotes unanimous agreement of the partners, not a majority in interest. Our construction of section 2.5 also holds true when we consider other provisions of the agreement concerning partner decision-making.

The term "mutually agree" is used in that form or substantially similar variations in a number of other provisions in the contract. In addition to requiring mutual agreement of the parties to determine partner salaries, mutual agreement is also required to determine the location or locations in which the business will operate and which partners or employees, other than the manager, can be signatories on partnership bank accounts. Furthermore, the partnership agreement specifies a formula for determining the value of a withdrawing partner's interest, which includes a fixed lump sum figure that can be varied only upon mutual agreement of the partners.

In contrast, the term "majority in interest" is specially defined in section 3.11 of the agreement to mean "those partners owning more than fifty percent (50%) of the capital interest." Per section 3.11, a "majority in interest" is required to remove a partner as manager and select

14

another partner to assume the role. A "majority in interest" is also required to (1) borrow or lend money, (2) purchase items of equipment or consumable supplies costing more than $10,000.00, and (3) execute any mortgage, bond, or lease except for the premises in which the partnership maintains its principal office.

Similarly, the partnership agreement specifies certain situations that require more than a "majority in interest" vote. For example, a decision to hire a non-partner as manager requires the assent of a supermajority (or two-thirds) of the partnership interests. Likewise, the partnership agreement can be "altered, amended, or cancelled at any time by agreement in writing between seventy-five percent (75%) or more in interest of the partners, except that an amendment affecting the rights of a former manager or supervisor pursuant to Section 2.5 [which authorizes retirement payments to partners who are former managers and supervisors, in addition to governing salaries of working partners] shall require the affirmative written agreement of one hundred percent (100%) of the interest of the partners."

The foregoing provisions detail with particularity the actions that may be carried out with less than unanimity of assent. Because Andrew and John's cramped construction of section 2.5 would render these provisions superfluous, we do not believe that construction is reasonable. *See Coker*, 650 S.W.2d at 394 (mandating that courts "favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless"). The fact that the agreement uses the phrase "one hundred percent (100%) of the interest of the partners" to convey a requirement of unanimity in one context, instead of the phrase "the partners mutually agree," does not alter our conclusion or create an ambiguity because that

particular phrase is used in contrast to a specified circumstance in which less than unanimous agreement is required but in which a prescribed majority of partnership interest is necessary.

In sum, there is no definition of the term "mutually agree" that would support Andrew and John's interpretation as meaning a majority in interest or a majority of the working partners. *Accord AFCO Credit Corp. v. Maryland Ins. Admin.*, 16 A.3d 1017, 1026 (Md. Ct. Spec. App. 2011) (holding that statute requiring "mutual consent of the parties" to postpone hearing required parties' unanimous consent). Nor is there any textual support for that interpretation. Moreover, there is no evidence suggesting that, at the time the partnership agreement was executed, it would have been difficult or impossible to obtain unanimous consent of the partners concerning such matters on a reasonably frequent basis. *Cf. Andrews v. Stearns-Roger, Inc.*, 602 P.2d 624, 628-29 (N.M. 1979) (phrase "mutually satisfactory settlement" not intended to require unanimous decision of committee because partisan composition of committee made it "unreasonable to surmise that a unanimous decision would be a predictable result on a frequent basis"). Therefore, we conclude that section 2.5 of the 1979 partnership agreement unambiguously requires consent of all the partners in order for a partner to be compensated for working at TLS.

This determination does not end our inquiry, however, because Andrew and John also moved for summary judgment based on limitations and opposed Russell's motion for summary judgment on the grounds of waiver, quasi-estoppel, and mutual mistake of fact. We hold that Andrew and John conclusively established limitations as a bar to any damages for breach of section 2.5 that accrued more than four years before this lawsuit was filed. As to the remaining damages, we hold that there is at least a fact issue regarding waiver, which precludes summary

16

judgment in Russell's favor. Even if we determined that waiver has been established as a matter of law, Andrew and John did not move for summary judgment on that basis. Accordingly, remand is the greatest relief available in light of the procedural posture of this case.

A cause of action for breach of contract generally accrues when the breach occurs, and limitations begins to run upon accrual. *Barker v. Eckman*, 213 S.W.3d 306, 311 (Tex. 2006). The limitations period applicable to breach-of-contract claims is four years. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (West 2008). Russell contends that limitations is tolled either by the discovery rule or due to fraudulent concealment. We disagree. The discovery rule is inapplicable to Russell's claim as a matter of law because the nature of the injury is not inherently undiscoverable. *Barker*, 213 S.W.3d at 312 ("In order for the discovery rule to apply, the nature of the injury must be inherently undiscoverable."); *see also Via Net U.S. v. TIG Ins. Co.*, 211 S.W.3d 310, 313-14 (Tex. 2006) ("'An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence.'" (quoting *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734-35 (Tex. 2001))). Furthermore, there is no evidence that either Andrew or John made any false or fraudulent statements concerning their compensation. In fact, Russell knew the material facts giving rise to a cause of action well before limitations expired; he was a signatory to the 1979 agreement, which included the unambiguous language on which he relies in this lawsuit, and he knew working partners were receiving compensation without his consent. *See Kerlin v. Sauceda*, 263 S.W.3d 920, 925 (Tex. 2008) ("Fraudulent concealment will not . . . bar limitations when the plaintiff discovers the wrong or could have discovered it through the exercise of reasonable diligence."); *see also Barker*, 213 S.W.3d at

17

311-12 ("[T]he discovery rule may defer accrual of a cause of action until the plaintiff knew or, by exercising reasonable diligence, should have known of the facts giving rise to a cause of action."). Despite knowledge of these facts, the evidence shows that Russell never asserted his rights under article 2.5, never complained about compensation paid without unanimous partner consent, and never made any inquiries concerning partner compensation. Instead, he waited nearly 30 years to invoke his contractual right to participate in decisions about partner compensation. It is immaterial that Russell may not have known the amount or the extent of the compensation being paid because, as Russell alleges, the partnership agreement precludes the payment of *any* compensation without partner approval. We therefore hold that Russell's breach-of-contract claim under article 2.5 is barred by the statute of limitations as to claims accruing more than four years before this lawsuit was filed.

As to claims accruing thereafter, we agree that a fact issue exists regarding whether Russell waived his right to enforce article 2.5. *See Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996) (stating that waiver exists if party intentionally relinquishes known right or engages in intentional conduct inconsistent with claiming that right). At a minimum, Russell's inaction over the nearly 30 years preceding the filing of this lawsuit, coupled with his knowledge of both the terms in the partnership agreement and compensatory partner payments inconsistent with the terms of the contract, are some evidence of his intent to waive the right to participate in TLS partner compensation determinations. *Id.* ("Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver."). We therefore affirm the trial court's take-nothing summary judgment on Russell's article 2.5

18

breach-of-contract claim in part, and we reverse and remand in part for further proceedings. Our disposition of these issues obviates the need to consider whether Andrew and John raised a fact issue on their quasi-estoppel and mistake-of-fact defenses because a favorable determination as to those issues would afford them no greater relief.

### *Access to TLS Records and Books*

Russell contends that Andrew and John breached section 1.5 of the partnership agreement by repeatedly denying him access to TLS's records and books. There is no evidence to support this claim. To the contrary, the evidence in the record affirmatively establishes that neither Andrew nor John ever denied Russell such access.

Per the partnership agreement, the records and books are to be maintained at TLS's principal place of business and are to be made available for partner access at all times. *Cf.* Tex. Bus. Orgs. Code Ann. § 152.212 (West Pamph. 2010) (requiring access only during ordinary business hours). There is no evidence that TLS's books and records were not maintained at the principal place of business or that Russell ever went to TLS's offices and was denied access to the books and records. Moreover, via affidavit, Andrew and John affirmatively stated that Russell had never gone to TLS's principal place of business and requested access to the books and records and neither of them had ever denied him access. These statements are clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted, but were not. *See* Tex. R. Civ. P. 166a(c) ("A summary judgment may be based on uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistences, and could have been readily controverted.").

19

Furthermore, neither the 1979 partnership agreement nor Texas general partnership law requires that partners *deliver* the books and records (or copies of the same) to a partner. The only requirement is that partners be allowed access. *See* Tex. Bus. Orgs. Code Ann. § 152.212 ("'[A]ccess' includes the opportunity to inspect and copy books and records during ordinary business hours."). In any event, even if there were such a requirement, there is no evidence that Andrew or John refused any request for copies of TLS's books and records.

In his affidavit opposing Andrew and John's motion for summary judgment, Russell averred that he made requests to see TLS's books and records that went unanswered, but he does not indicate to whom he made such requests or whether the requests were made at the principal place of business or otherwise: "On no less than 3 separate occasions since 2004, I requested to see the books and records of TLS and my requests were never complied with." He did not testify that he made any requests to Andrew or John, and there is no direct or circumstantial evidence from which a jury could reasonably infer that Russell actually made any requests to either Andrew or John or that he was turned away at TLS's principal place of business on any occasion. When Russell's statement is read in conjunction with a sentence in his affidavit that follows, it could be interpreted to *imply* that Andrew and John denied his requests, but not necessarily so. Russell stated, "If the Defendants had given me access to the books and records of TLS[,] I would have discovered the Defendants paying themselves these unauthorized bonuses . . . ." This statement is but a truism and in no way constitutes evidence that Russell made any requests to Andrew or John or that either of them denied any such request. Neither of Russell's averments controverts the positive statements in Andrew's and John's affidavits and deposition testimony.

20

The record also includes a letter to TLS's attorney, dated May 18, 2008, which requested that TLS provide a date within 90 days that Russell could come to TLS's offices to review the books and records: "Within the next 90 days[,] my client needs access to the TLS partnership books and records as he would like to have his auditor review the books and records, [sic] could you please provide us dates that he may come to the TLS headquarters as soon as possible." Well before the 90-day time period had expired, however, Russell filed this lawsuit. Although Andrew and John admittedly did not provide Russell with any specific dates of availability, the letter was not directed to them. More importantly, there is no evidence that they ever refused to allow Russell an opportunity to inspect and copy TLS's records and books. Failure to specify a time and date upon request is not tantamount to denial of access when the partnership agreement already specifies that partners may have access at any time and there is no evidence that such access was affirmatively denied. The trial court properly granted summary judgment as to this claim as well as any breach-of-fiduciary-duty claims predicated on the same allegations.

### Sale of Janet's TLS Partnership Interest

On April 1, 1994, Andrew and John separately purchased one-half of their mother's 25% partnership interest in TLS for $100,000 each, payable with interest over a 144-month period. Although the terms of sale were apparently acceptable to Janet, Russell alleges that the initial terms of sale and amended terms of sale violated sections 4.41 and 4.43 of the partnership agreement. Section 4.41 requires that payment to a withdrawing partner be completed within six months after the partner's withdrawal, and it is undisputed that the terms of sale here did not comport with this requirement. Section 4.43 requires that any promissory note to purchase another partner's interest

21

must be secured by a lien upon the partnership interest being purchased. In this case, the initial purchase notes included the requisite security interest, but Russell alleges that the notes were amended in 2001 to eliminate the security interest, in violation of section 4.43.

As a preliminary matter, we note the absence of any evidence that Andrew, John, and Janet failed to comply with section 4.43's security interest requirement. Several witnesses, including Andrew and John, testified that amended notes were executed to lower the interest rate, but no witness recalled that the amended notes eliminated the requisite security interest. The record only includes *unexecuted* amended notes that lower the interest rate and omit a security interest. Even if the amended notes were actually executed, which is not evident from the record, we conclude that the trial court properly granted summary judgment on Russell's claims arising from the sale of Janet's interests because there is no evidence that either Russell or TLS were damaged or injured by any deviations from the requirements in sections 4.41 and 4.43.

To prevail on a breach-of-contract claim, a plaintiff must establish an injury resulting from the breach. *Roundville Partners, L.L.C. v. Jones*, 118 S.W.3d 73, 82 (Tex. App.—Austin 2003, pet. denied). We find no evidence that TLS was injured by any noncompliance with section 4.41 or section 4.43, but Russell contends that he was injured because, if the sale is rescinded due to breach, he will be able to purchase a pro-rata share of his mother's interests pursuant to section 4.25 of the agreement. That section provides:

> In the event a partner withdraws or dies and no disposition of such partner's interest is made under 4.23 [sale or assignment to another partner] or 4.24 [devise to another partner] above, each remaining partner shall have an option to purchase a proportionate share of the interest of any withdrawing or deceased partner at the price set forth in Article 4.3 and on the terms and conditions set forth in article 4.4. The

22

term "proportionate share" shall mean that fraction of the interest of the selling partner which is represented by the ratio of the interest of a buying partner to an entire interest in the partnership, except the interest offered for sale. In addition, if any remaining partner or partners do not elect to purchase his or her proportionate share of the withdrawing or deceased partner's interest, or any portion thereof, the other partner or partners shall have an option to purchase such proportionate share, or unpurchased portion thereof, such option to be exercised within the time limits prescribed in Article. 4.26.

Based on the terms of section 4.25, Russell could benefit from having the sale unwound because his mother is no longer capable of either executing a new contract for sale in accordance with the terms of the partnership agreement or passing her interest by devise. Nonetheless, he has shown no current injury resulting from the alleged deviations from the contractually prescribed terms of sale. The damage theory he posits impermissibly inverts the breach-of-contract injury analysis because his alleged injury is contingent on a finding of actionable breach in the first instance. Because there is no evidence that either Russell or TLS was in any way damaged or injured by the extended payment terms and lack of a secured interest, if any, the trial court properly granted summary judgment on this claim.

### *Competition, Misappropriation of Trade Secrets, and Copyright Infringement*

Russell contends that Andrew violated the partnership agreement's covenant not to compete (section 7.41) by owning, operating, or conducting business with similar legislative tracking services in other states solely on his own behalf and not in furtherance of TLS's interests. He further contends that, in connection with establishing these businesses, Andrew misappropriated TLS's trade secrets—specifically TLS's business methods and software for tracking, accumulating, organizing, and distributing legislative information—and infringed on TLS's copyright in the proprietary

23

software systems TLS allegedly owns and utilizes in its business. Russell further asserts that these acts also constituted a breach of the duties of loyalty and care.

Andrew and John jointly moved for summary judgment on Russell's claims, asserting that (1) the contractual noncompete agreement only applies when a partner is no longer a TLS employee or partner, (2) there is no evidence that Andrew's other businesses compete with TLS, (3) there is no evidence that Andrew or John solicited, serviced, or sold any of TLS's customers or clientele any services or products of the type performed or sold by TLS, (4) there is no evidence that Andrew or John used or disclosed TLS proprietary information or trade secrets in dealings with other entities, (5) there is no evidence that Andrew or John used or disclosed any copyrighted information owned by TLS, (6) there is no evidence that TLS or Russell were damaged by Andrew's activities with other legislative tracking services, and (7) the noncompete, trade-secret-misappropriation, and copyright-infringement claims are all barred by the applicable statutes of limitations.

It is undisputed that Andrew has owned and operated legislative tracking services in other states and that such businesses offer the same basic services and functionality for the legislatures in those states that TLS provides for the Texas legislature. The software systems used by these businesses are apparently the same or substantially similar to the software TLS uses. It is further undisputed that Andrew has retained the monetary benefits of these transactions for himself and has neither engaged in these businesses on behalf of TLS nor shared the financial benefits (if any) with TLS. There is no evidence that John has participated in these businesses or profited in any way, directly or indirectly. There is likewise no evidence that TLS itself has ever offered similar services outside the state of Texas, nor is there evidence that any of the out-of-state businesses have

24

ever offered similar services in Texas. The record further establishes that for at least fifteen years before this lawsuit was filed, Russell knew that Andrew was engaged in similar legislative services businesses outside the state of Texas, but he may not have known about every such business with which Andrew was affiliated. Russell testified that, although he knew about Andrew's other businesses, he assumed that TLS was somehow benefitting from these arrangements. He does not allege, however, that Andrew or John provided any false information concerning either Andrew's or TLS's relationship with these businesses.

As the foregoing recitation amply demonstrates, there is no evidence and no allegation that John has competed with TLS or misappropriated any of its trade secrets or copyrights. Accordingly, the trial court's summary judgment as to these claims against John is affirmed.

With regard to the claims against Andrew, there is no evidence that any of his businesses competed with TLS in Texas or elsewhere. Moreover, by its express terms, the noncompete provision does not apply because Andrew is still a TLS partner and employee. Section 7.41 applies "in the event the partner is no longer a partner in the partnership or is no longer employed by the partnership" and the term of the noncompetition period is explicitly tied to "the date of termination of employment or termination as a partner."

As for claims that Andrew breached a confidentiality agreement implicitly embodied in section 7.41 and misappropriated TLS trade secrets and copyrights, there is no evidence that Andrew disclosed any methods, processes, computer programs, customer lists, prices and pricing, markets, data regarding contracts and customer needs, or other trade secrets owned by TLS. The mere fact that Andrew's companies provide the same basic services as TLS likewise does not create

25

a fact issue in this regard. In response to Andrew and John's motion for summary judgment, Russell provided website screen shots from a number of similar businesses that Andrew owns or has owned in other states, which indicate that these businesses are claiming to use the same or substantially similar software systems to those TLS uses. Andrew does not appear to dispute that the software systems are, in fact, the same. He asserted in a sworn affidavit, however, that he developed the software himself through his out-of-state business interests and that TLS uses but does not own the rights to the software.

An essential element common to both trade-secret-misappropriation claims and copyright-infringement claims is that the trade secret or copyright is owned by the complainant. *See*, *e.g.*, *Feist Pubs., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991) (stating elements of copyright infringement action); *Rusty's Weigh Scales & Serv., Inc. v. North Tex. Scales, Inc.*, 314 S.W.3d 105, 109 (Tex. App.—El Paso 2010, no pet.) (stating elements of common-law trade-secret-misappropriation claim). In this case, there is a dispute concerning ownership of the software used by TLS and the other legislative tracking businesses, but the only evidence offered in that regard is Andrew's affidavit in which he testified that he developed and owns the software systems TLS and the other businesses use. Russell has cited no contrary evidence, either in his brief on appeal or in response to Andrew and John's motion for summary judgment, nor can we find any in the record. Although the software appears to have been created during the time Andrew was employed at TLS, there is no evidence that Andrew's job responsibilities at TLS included software development. Likewise, there is no evidence that he or any other TLS employee was tasked with or paid for developing software for the company. In addition, there is no evidence that Andrew used

26

TLS resources or property to develop the software. Therefore, there is no evidence from which a jury could reasonably infer that TLS owns the software at issue, or otherwise contradict Andrew's assertions that it is owned by him. Nor is there any evidence that it was a "work made for hire" within the meaning of the U.S. Copyright Act. *See* 17 U.S.C.A. §§ 101 ("A 'work made for hire' is . . . a work prepared by an employee within the scope of his or her employment . . . ."), 201(b) (2006) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title [unless there is an express agreement to the contrary]."). Accordingly, the trial court properly granted summary judgment in favor of Andrew on Russell's breach-of-contract, misappropriation-of-trade-secrets, and copyright-infringement claims.

**Breach-of-Fiduciary-Duty Claims**

In addition to the claims for breach of contract, trade secret misappropriation, and copyright infringement, Russell also alleged that Andrew and John breached their fiduciary duties of loyalty and care to TLS and its partners by (1) refusing to give an accounting for TLS, (2) self-dealing, (3) competing with the partnership by opening similar companies in other states, (4) paying excessive compensation and large bonuses, (5) funding self interests with partnership profits, (6) failing to disclose raises or bonuses, (7) failing to act in good faith in discharging the partner's duties, (8) using the partnership's proprietary and trade secrets, and (9) failing to disclose competitors and other companies in which Andrew has an interest. These claims are based on the same factual predicates underlying the breach-of-contract, trade-secret-misappropriation, and copyright-infringement claims. As a result, to the extent we have affirmed summary judgment on

27

those claims, we likewise affirm summary judgment on the related breach-of-fiduciary-duty claims.

In addition, the record is devoid of any evidence to support the allegation that Andrew and John refused to give an accounting for TLS. Moreover, on appeal Russell did not challenge the trial court's ruling on this claim; therefore, any error in the trial court's judgment is waived. *See Secure Comm, Inc. v. Anderson*, 31 S.W.3d 428, 430-31 (Tex. App.—Austin 2000, no pet.) (holding that appellant waives right to complain of ruling to which no error was assigned). Therefore, the trial court's summary judgment as to that claim is also affirmed.

With regard to the breach-of-fiduciary-duty claims arising from Andrew's and John's payment of compensation other than as authorized by section 2.5 of the partnership agreement, we have determined that the breach-of-contract claim is partially time-barred and that there is a fact issue regarding waiver. That analysis is equally applicable to fiduciary-duty claims predicated on the same conduct, and the limitations period for breach-of-fiduciary-duty claims is the same as for breach of contract. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(5) (West 2002).

To the extent the breach-of-fiduciary-duty claims are not time-barred, Andrew and John also moved for summary judgment on the ground that the claims are barred by the economic-loss rule. The economic-loss rule generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract. *See Stauffacher v. Coadum Capital Fund 1, L.L.C.*, 344 S.W.3d 584, 591 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Although the contours of the economic-loss rule are less than precise,[11] the Texas Supreme Court

---

[11] *See* Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 534 ("The truth may be that there is not one economic loss rule broadly

28

has held that a party who seeks damages for breach of a duty created under a contract, as opposed to a duty imposed by law, cannot recover tort damages for the breach. *See Southwestern Bell Tel. v. Delanney*, 809 S.W.2d 493, 493-94 (Tex. 1991) (considering "whether a cause of action for negligence is stated by an allegation that a telephone company negligently failed to perform its contract to publish a yellow pages advertisement"); *see also Sharyland Water Supply Corp. v. City of Alton*, No. 09-0223, 2011 WL 5042023 at *5-7 (Tex. Oct. 21, 2011) (discussing evolution of economic-loss rule under Texas law, including *Delanney* case).

Although we cannot say that the economic-loss rule never allows recovery of tort damages under a breach-of-fiduciary-duty theory solely because there is a contractual arrangement between the parties, in this case we believe that the economic-loss rule applies because the damages alleged arise only from the nonperformance of duties governed by the partnership agreement and because there is no evidence that either Andrew or John made false statements or representations about their compensation. Because there can be no partner compensation other than under the terms of the partnership agreement, and because the partnership law specifies that the terms of the partnership agreement govern the relations between the parties, Tex. Bus. Orgs. Code Ann. §§ 152.002(a), 152.203(c), the nature of the injury in this case emanates from nonperformance of the partnership agreement itself and is thus is more appropriately characterized as a breach-of-contract claim. Moreover, Russell cites no evidence of damages independent of those suffered due to noncompliance with the partnership agreement. *See Stauffacher*, 344 S.W.3d at 591 ("Whether

---

applicable throughout the field of torts, but rather several more limited rules that govern recovery of economic losses in selected areas of law.")

couched as a violation of the economic-loss rule or simply as a lack of evidence to support the submission of a jury question [regarding damages for breach of fiduciary duty], the result is the same—Coadum put on no evidence of damages independent of those suffered as a result of Stauffacher's breach of the joint-venture agreement."). Therefore, we affirm the trial court's summary judgment on each of Russell's breach-of-fiduciary-duty claims.

## CONCLUSION

For the reasons stated, we reverse in part the portion of the trial court's summary judgment concerning noncompliance with section 2.5 of the partnership agreement; claims accruing more than four years before this lawsuit was filed are barred by limitations, but to the extent such claims are not time-barred, we cannot render judgment in Russell's favor because a fact issue remains concerning the affirmative defense of waiver. Therefore, that portion of the cause is remanded to the trial court for further proceedings. In all other respects, the trial court's summary judgment is affirmed.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Henson;
  Concurring and Dissenting Opinion by Justice Henson

Affirmed in Part; Reversed and Remanded in Part

Filed: January 27, 2012

30